Filed 8/3/22  In re N.B. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| In re N.B. et al., Persons Coming Under the Juvenile Court Law. | C094264 |
| SHASTA COUNTY HEALTH AND HUMAN SERVICES AGENCY, Plaintiff and Respondent, v. H.B., Defendant and Appellant. | (Super. Ct. Nos. 12JVSQ2949901, 12JVSQ2950001) |

Appellant H.B., great-aunt of the minors, appeals from the juvenile court's order denying her petition to terminate the minors' guardianship and grant her a temporary guardianship instead.  (Welf. & Inst. Code, §§ 388, 395.)[1]  Finding no merit in appellant's claim, we will affirm the juvenile court's order.

---

[1]  Undesignated statutory references are to the Welfare and Institutions Code.

1

## BACKGROUND

The minors, N.B. and C.B., entered the child welfare system in 2012. They were initially placed in a permanent guardianship with the paternal grandmother and R.B., their stepgrandfather (guardian). When the paternal grandmother died in 2018, the guardian "exhibited a decline in self-care and judg[]ment." The maternal grandmother requested that she be allowed to assume guardianship of the minors, triggering a bonding study that included the minors, the guardian, and the maternal grandmother. Her request was ultimately denied.

## I

### *2018 Bonding Study*

The 2018 bonding study showed that, after the passing of the paternal grandmother, the guardian experienced a "precipitous decline in psychological functioning" and made several poor choices, the most significant of which was to allow the minors' mother back into a parenting role despite that she had been abusing and was continuing to abuse drugs.[2] The guardian reportedly had difficulty addressing his needs, and his issues affected his decisionmaking and his ability to appropriately care for the minors. However, he eventually worked to improve his parenting skills, he obtained housing, he expanded his support network, and he provided for the minors' educational, emotional, psychological, and physical needs. There was no evidence that the guardian had been abusive toward the minors. The minors felt safe with and were bonded with the guardian. The study concluded that the minors had a very strong, parental bond with the guardian, severance of which would have a detrimental impact on them.

---

[2] The minors' mother is deceased. The date of her death is unclear from the record.

2

## II

### *Appellant's Petition For Guardianship*

In 2020, appellant petitioned the court for guardianship of the minors. Her petition, which was supported by the minors' father J.B. (father) and the maternal grandmother, alleged physical and sexual abuse by the guardian. Appellant also alleged the guardian was not adequately caring for the minors or attending to their medical, educational, health, or hygiene needs.

## III

### *2021 Bonding Study*

J. Reid McKellar, Ph.D., conducted a second bonding study in March 2021. His findings were as follows: Following the 2018 bonding study, the minors were diagnosed with attention deficit hyperactivity disorder (ADHD) for which they received psychiatric treatment and counseling services. They remained under the guardianship of their paternal stepgrandfather, who continued to support visitation between the minors and various family members, including appellant. The guardian remained active in receiving services to enhance his parenting efforts, maintained the minors' psychiatric treatment and medical care, and was active in addressing the minors' educational needs.

### A

### *Interview Of Appellant*

Appellant regularly referred to the guardian as the minors' "foster parent" and their "kidnapper," and stated she had been trying to "educate" the minors that the guardian was neither their grandfather nor a relative and that they should not refer to him as such. She claimed the minors were doing poorly in school because the guardian did not take the minors' education seriously and was a "bad teacher," and he failed to prepare the minors for distance learning during the pandemic.

Despite the fact that none of appellant's earlier allegations of physical and sexual abuse by the guardian were substantiated by law enforcement entities or the Shasta

County Health and Human Services Agency (Agency), appellant continued to claim the guardian was a "known sexual offender" and the minors were at risk of being sexually abused by him. She based her claim on allegations by the minors' father that the guardian took pictures of his adolescent daughters, pointing the camera up their skirts. Appellant reported the minors' father was clean and sober (after multiple failed treatment efforts) and she planned for him to play an active role in the minors' care.

Appellant informed Dr. McKellar that she had previously been considered for placement of the minors early on but there were concerns due to several domestic violence reports regarding her then husband, whom she subsequently divorced. Appellant reported she had a good income and that she had purchased a home in Shasta County in 2019 to provide a permanent placement for the minors.

B

*Interview Of Guardian*

The guardian became emotional during his interview and expressed sadness that his character continued to be attacked and his motivations and parenting efforts questioned in court and at the Agency due to appellant's accusations. He felt appellant was actively attempting to damage his reputation as a person and a parent, including accusing him of sexually abusing children, claims that were found to be unsubstantiated. He reported he had attended a nurturing father's program and was attending parenting courses and becoming active in parenting groups. He continued to allow regular family visitation even after the maternal grandmother's attempt to assume guardianship in 2018.

The guardian stated the minors were being treated for ADHD and receiving therapy for trauma and behavioral issues. They had been making considerable progress in their relationship with each other and their general functioning prior to appellant's attempts to obtain guardianship of them. While N.B. struggled with anger control issues, he had been "very secure" in his placement with the guardian. However, when that placement was threatened by the custody battle initiated by appellant, N.B. regressed

4

emotionally and was prone to oppositional behavior and conflict with his sister, C.B., who had also become more emotional and had found her sense of security threatened. The minors' relationship with one another had deteriorated over the past several months. N.B. had been acting more blatantly defiant and C.B. had become more timid since the custody battle began.

## C

### *Interview With N.B.*

N.B. described appellant (his great-aunt) as "nice" and said her home was "very nice" and nicer than the guardian's home. N.B. said he enjoyed visiting appellant when he could swim and play on the cell phone appellant bought for him. He stated that, if he had an important secret to share or he needed help, he would seek out the guardian. He also stated he enjoyed spending time at appellant's house but felt most at home at the guardian's home.

## D

### *Interview With C.B.*

C.B. described appellant as "sweet and nice." She described the guardian as "[a] caring person. I love him, he loves me." C.B. reported she did not feel comfortable at appellant's house but felt at home at the guardian's house. Dr. McKellar asked C.B. what she would want if she had three wishes; C.B. said one of her wishes was a new house where she would live with N.B. and "Grandpa [the guardian]."

## E

### *Interactions Between Minors, Guardian, And Appellant*

When Dr. McKellar observed the guardian and the minors together, he noted the minors seemed "extremely comfortable" and did not exhibit any signs of emotional distress or attachment disturbance. The guardian seemed relaxed as he related to both minors in a "developmentally appropriate manner," setting appropriate limits when necessary and effectively managing the cleanup transition at the end of the visit. N.B.'s

interactions with the guardian suggested a "well-established rapport." C.B. sat close to the guardian and her body language and social responses suggested a strong attachment to him. The guardian kept a close watch on the minors and intervened appropriately when necessary.

Dr. McKellar also observed appellant and the minors together, noting the minors looked very unhappy when they entered his office. C.B. spent most of the visit curled up at the end of the couch either sleeping or feigning sleep. N.B. sat at the opposite end of the couch and spent most of the time arguing with appellant, asking to leave, or sitting with his jacket pulled over his face. Dr. McKellar observed that most of appellant's interactions with the minors were antagonistic. Dr. McKellar said that appellant's main focus was to demonstrate that the guardian was an inept caregiver or to highlight past events during which the minors enjoyed being with her, the maternal grandmother, and father. Appellant complained about the guardian's care of the minors, claiming the minors always smelled bad after being with the guardian; the guardian did not properly medicate N.B., who behaved poorly when not on his medication; and the guardian did not change the minors' clothes or the cat's litter box. Appellant confronted N.B. about taking his medication. She argued with C.B. when C.B. attempted to defend the guardian, and she berated C.B. for taking a nap during the visit. As a result, N.B. became upset and C.B. became emotionally withdrawn. Appellant cajoled C.B. into playing a game with her, but N.B. refused to engage or make eye contact with appellant. Dr. McKellar noted that appellant seemed oblivious to the emotional effect her behavior had on the minors.

F

*Dr. McKellar's Conclusions*

Dr. McKellar concluded the minors had a close, nurturing attachment with the guardian and their bond with the guardian was the primary source of their psychological stability. The guardian parented the minors through several critical developmental phases, including grieving for and recovering from the loss of the guardian's wife (the

6

minors' paternal grandmother).  The guardian continued to receive services to improve his parenting skills and vigorously advocated for the minors' educational and health needs.  He maintained the minors' mental health treatment through the pandemic, and he supported the minors' education, resulting in improved academic performance by both minors.  The guardian also demonstrated a willingness to put the needs of the minors ahead of his own as demonstrated by his continued support of regular visitation despite attempts by appellant and the maternal grandmother to obtain guardianship of the minors and despite appellant's repeated allegations of child abuse leveled at the guardian.

Dr. McKellar said that, while several factors had undermined the minors' psychosocial progress in recent months, including the pandemic and a prolonged custody dispute with appellant, none of those factors were directly attributable to the guardian.  He said that the custody dispute might have been less of a concern "if the adults involved, other than [the guardian], were acting in a manner that considers the needs of the children."  Dr. McKellar continued:  "However, [appellant] has consistently acted in a manner to undermine [the guardian], for example by making frequent calls to Shasta County [child protective services] complaining about [the guardian's] care and by making child abuse claims.  In addition, [appellant] has seemed to give little thought to the impact of her efforts on the children's well-being, and she reported that she has made active efforts to undermine the children's perception of their guardian (i.e.[,] by insisting that they do not call him 'grandpa')."

Dr. McKellar noted that the interactions he observed between appellant and the minors were "the most dysfunctional [he] has observed in over twenty years of doing bonding studies in the family court and dependency court system" due, in part, to the fact that appellant attempted to prove the guardian's incompetence through the minors.  Finally, Dr. McKellar noted that during interviews and while observing appellant with the minors, appellant exhibited concerning behavior, which demonstrated she had little to no understanding of child development or the fact that both minors had neurodevelopmental

7

disorders and a significant trauma history, and she applied a communication and discipline style that may work for adults but "would certainly not work for children or even adolescents."

Dr. McKellar concluded that the minors had a "fair" bond with appellant, severance of which would not be detrimental to either minor, but they had a "strong" bond with the guardian, severance of which would have a detrimental impact on both minors.

IV

*Appellant's Section 388 Petition*

On July 27, 2020, appellant filed a section 388 petition requesting that the court remove the minors from their guardian's care and place them in appellant's home under a temporary guardianship. Appellant alleged as changed circumstances the fact that she had filed a probate petition for guardianship with multiple supporting declarations, she believed the minors were living in an unsafe environment, and she believed the minors had been exposed to substance abuse and had "lived homeless." Appellant alleged the request was in the minors' best interests because she believed the minors would thrive in her care, she was approved as a family resource member, and she was a computer scientist for the U.S. Navy. Appellant further alleged that the minors' biological father had previously nominated appellant as the minors' guardian. Appellant did not serve any of the parties with the petition.

V

*Judge Gibson's Order*

On July 28, 2020, the juvenile court (Judge Gibson) checked the box on a Judicial Council form JV-183 court order granting a hearing on appellant's section 388 petition "because the best interest of the child may be promoted by the request." The hearing was set for August 11, 2020. At that time, appellant's petition and supporting declarations had yet to be served on the parties.

8

## VI

### *Appellant's Declarations In Support Of Section 388 Petition*

On August 5, 2020, appellant filed her own declaration and the declarations of father and a private investigator in support of her petition. The private investigator declared he interviewed the guardian and, based upon things the guardian told him, it was his belief that appellant was "best suited to provide a stable environment" for the minors and it would be in the minors' best interests to be placed with appellant. Father declared the guardian (father's stepfather) did a poor job raising him (father) as a child and therefore did not have the skills necessary to properly raise the minors. Father further declared that it was his desire that the minors be placed with appellant. Appellant declared the guardian was a danger to the minors for various reasons, that she had been approved as a family resource member, that the guardian "is in fact not the guardian," and that she would be the best "adoptive family" for the minors. Appellant set forth the reasons she believed the guardian had made "numerous poor choices," and explained why she was the better choice as guardian to the minors. Appellant also stated that father wanted her to be the minors' guardian. Appellant did not serve any of the parties with the supporting declarations.

## VII

### *Hearings On Appellant's Section 388 Petition*

At the initial hearing on appellant's section 388 petition on August 11, 2020, the court granted the Agency's request to reinstate dependency proceedings and continued the matter due to appellant's failure to serve the parties with the section 388 petition. The court also granted appellant's section 827 motion to receive a copy of the guardianship file.

At the continued hearing, appellant still had not yet served the parties with her petition. She made an oral motion for documents related to her previously filed petition for probate guardianship and she requested visitation. She further requested, over the

9

objection of counsel for the minors, that the court interview the minors to ascertain where the minors wanted to live. The court denied appellant's request to interview the minors and her request for visitation and continued the hearing. Appellant subsequently filed additional section 827 petitions seeking records from various social workers dating back to the original removal of the minors from their parents' home in 2012 and 2013.

On October 9, 2020, the court ordered visitation between the minors and appellant every other weekend, denied appellant's request that the guardian submit to a bonding study, and ordered the parties not to discuss the case with the minors.

VIII

*Appellant's Supplemental Declarations*

On November 5, 2020, appellant filed three separate supplemental declarations in support of her section 388 petition. The first declaration included concerns about the guardian, including the guardian's failure to properly clothe the minors, be consistent with their medications, and obtain proper care for N.B. after he was bitten by a dog. Appellant also expressed concerns about the guardian's disparate treatment of the minors and C.B.'s behavior, including stealing and lying, acting aggressively, not wearing underwear or behaving with modesty, wetting her bed, and exhibiting developmental issues, and the guardian's failure to provide the minors with "suitable electronic resources." The second declaration set forth information appellant obtained from father (her nephew), which father obtained from social worker Lorna Oden regarding the guardian. The third declaration set forth "changes in the visitation routine" since August 11, 2020, including the guardian's alleged refusal to allow the minors to visit appellant's home and a chronological account of text messages between appellant and one or both of the minors.

## IX

*Hearings On Appellant's Motions And Section 388 Petition*

On November 12, 2020, the court ordered that certain documents, including a previous bonding study of the guardian and the minors by Dr. McKellar, be disclosed to appellant. Appellant again requested all documents from the Agency regarding alleged child abuse perpetrated by the guardian. The court informed appellant that, after an in camera review of the Agency's documents, the court found nothing related to such alleged child abuse despite appellant's belief that such documents existed.

Guardian's counsel argued appellant's section 388 petition failed to meet the threshold requirement for a hearing and requested that the petition be denied. Appellant argued the court (Judge Gibson) previously found appellant was entitled to a hearing on her petition. The court (Judge Bigelow) reviewed Judge Gibson's previous minute order and noted it did not "really address[] the merits of whether or not there had been a change of circumstances." The court concluded Judge Gibson had not made a finding of changed circumstances but allowed appellant to argue changed circumstances before making a final ruling.

Referring to Judge Gibson's order, the court noted Judge Gibson ordered a hearing on appellant's JV-180 request to change court order form " 'because the best interests of the child may be promoted by the request the hearing will take place on,' " "[w]hich means that Judge Gibson did make the finding that change of circumstances had occurred." Based thereon, the court initially stated there would be a hearing on appellant's petition. However, after further argument by counsel, the court reserved on the issue of whether appellant in fact made a prima facie showing sufficient to trigger an evidentiary hearing and allowed appellant to present evidence in support of her petition.

11

## X

### *Minors' Section 388 Petition*

On February 25, 2021, the minors filed a section 388 petition requesting that the court find that ongoing visitation between the minors and appellant was detrimental to C.B. and was undermining the guardian's relationship with C.B. The petition was based on the concerns expressed by Dr. McKellar following his observations of contact between the minors and appellant.

Appellant filed a motion objecting to the minors' petition to which she attached a bonding assessment conducted by Dr. Eugene Roeder. Dr. Roeder concluded that the minors had a close and positive attachment with appellant; however, he found the question of whether it would be detrimental for the minors to continue to live with the guardian or whether it would be in their best interest to live with appellant "is a determination beyond the scope of a relationship study of the situation involving [appellant] and [the minors]." Appellant also filed a supplemental declaration disputing Dr. McKellar's statements.

The court found it was in the minors' best interests to temporarily suspend visitation with appellant in order to give the minors "a break" and allow them time to participate in counseling. The court continued the matter for a status hearing on the minors' progress and subsequently set the matter for a contested hearing to determine whether visitation was appropriate.

## XI

### *Appellant's Second Section 388 Petition*

On March 12, 2021, appellant filed a second section 388 petition requesting that the court appoint separate counsel for C.B., order that the minors' medical prescriptions be shared with the court and all counsel, order the guardian to ensure proper dosage of each minor's medication, and summon social worker Lorna Oden to testify regarding having witnessed the commingling of medications. Appellant argued N.B. had become

increasingly emotionally and physically abusive towards C.B., particularly when he failed to take his medication as prescribed. She further argued that C.B. often appeared to be in an induced stupor, raising concerns she was being overmedicated. Appellant argued that, on several occasions, the minors arrived for visitation with appellant having their respective medications commingled in a single bottle with no dosing instructions. Appellant further argued the requested changes were in the minors' best interests because C.B.'s needs were distinct from N.B.'s needs, C.B.'s personal growth and development were being hindered, and there was a "real and present danger to both children of improper medication." In support of her petition, appellant submitted her previously filed supplemental declaration in response to Dr. McKellar's statements.

## XII

### *Hearing On Appellant's Second Section 388 Petition*

At the March 30, 2021 hearing, the court denied in part appellant's second section 388 petition seeking to appoint new counsel for C.B. and requesting documents and granted in part the petition regarding the minors' prescribed medications.

## XIII

### *Agency's Response To Appellant's First Section 388 Petition*

The Agency filed a response to appellant's original section 388 petition arguing that, based on multiple interviews and conversations between social workers and the minors, the guardian, and appellant, the social workers concluded that the guardian was providing safe, stable, and appropriate housing for himself and the minors and regularly sending the minors to school clean, well groomed, and happy. The minors were both doing well in school with no concerns regarding attendance. The guardian admitted using marijuana to meet his medical needs but stated he did not use it in the minors' presence, and he stored the marijuana in a sealed jar inside a locked safe box that was inaccessible to the minors.

The social workers concluded the minors were receiving ongoing medical and dental care and appeared to be healthy with no concerns from school personnel as to their overall health. The minors were taking their medications. The guardian noted "substantial behavior changes" with N.B. about which he planned to speak to the minor's doctor at an upcoming appointment. The guardian requested assistance in meeting the minors' counseling needs, was undertaking efforts to learn better forms of disciplining the minors, was reportedly rebuilding his support system, and was willing to keep the minors' father involved in the minors' life. The guardian's income was stable, and the minors' needs were consistently being met.

The minors reportedly had a bond with each other and the guardian and, based on Dr. McKellar's observations, appeared to be extremely comfortable in the guardian's presence, with no signs of emotional distress or attachment disturbance. On the other hand, the minors were reportedly unhappy when they were with appellant. N.B. argued with her, asked to leave, and pulled his jacket up over his face. C.B. replied to appellant with one-word responses and in a "quavering voice," and sat at the end of the couch curled up in a ball. Appellant seemed unwilling or unable to read the minors' cues and seemed intent on proving that the guardian was an inadequate caregiver.

XIV

*Hearing On Appellant's First Section 388 Petition*

The court heard appellant's original section 388 petition on April 7, 2021. The court (Judge Bigelow) first noted Judge Gibson's July 28, 2021 order setting the matter for a contested hearing was made "ex parte" and without a hearing "to determine the petitioner ha[d] met the initial burden." The court stated appellant had the burden of proof "to show by a preponderance of the evidence" a change of circumstances or new evidence and that removal of the guardian was in the minors' best interests. The court stated that, in October 2018, Judge Gibson made a judicial determination not to remove the minors from the guardian's care and, as such, the court would consider only change

14

of circumstances as of October 2018 "as it relates to the safety and well[-]being of the children in the care of [the guardian] or new evidence, evidence not previously known to the parties as of October of 2018, that is relevant to the court's determination in assessing the safety of the children in the care of the current guardian." The court also noted that, assuming the appellant's presentation of sufficient prima facie evidence to warrant a hearing, the court would limit the inquiry at the hearing to whether the guardian should be removed as guardian over the minors.

Regarding changed circumstances or new evidence, appellant argued the following: (1) N.B. was bit by two dogs and the guardian refused to report the incident; (2) the minors were being "horribly neglected" with respect to their school work; (3) the minors were "victims of horrible medical neglect" with respect to their medication; (4) there was "strong evidence of parental alienation" in that the guardian was alienating the minors from appellant; (5) the guardian was talking to the minors about the court proceedings despite being ordered not to; (6) appellant's regular visitation with the minors was "cut off" after she filed for guardianship; (7) the guardian had significant deterioration in his health over the last few years and was unable to adequately care for the minors; (8) the guardian had a history of methamphetamine and marijuana abuse and addiction and there was a concern he might still be using them; (9) the minors were not being adequately clothed; and (10) father, who was clean and sober, out of prison, and no longer a detriment to the minors, was in favor of appellant raising the minors.

Regarding the minors' best interests, appellant argued the minors had been medically and educationally neglected and subjected to "tremendous trauma" by the guardian. Father, who was no longer a detriment and who had a relationship with the minors, recommended appellant care for the minors. Appellant further argued she would be a "tremendous" guardian for the minors, would provide a great home for them, and would not neglect them as the current guardian had.

15

The Agency, counsel for the minors, and counsel for the guardian objected to appellant's arguments as either previously known to the court or conclusory and lacking in actual evidence. The court tentatively found there was neither a change of circumstances nor was the requested change in the minors' best interests. The court noted its ruling was tentative and subject to change in the event evidence was raised at the continued hearing on the minors' section 388 petition regarding visitation with appellant.

In that regard, the court found the minors met their initial burden of making a prima facie showing of change in circumstances and that it was not in the minors' best interest to continue visitation with appellant. Appellant opposed the petition, offering her own testimony regarding her relationship with the minors as well as the testimony of Dr. Roeder and Dr. McKellar. Dr. Roeder testified regarding the November 2020 relationship study he authored and his conclusion that the minors had "a close and positive attachment with [appellant]." Dr. McKellar testified regarding his bonding assessment related to his observation of appellant with the minors. The court continued the matter for a final ruling.

XV

*Final Hearing On Appellant's Initial Section 388 Petition*

On May 6, 2021, appellant presented additional evidence in support of her section 388 petition filed in July 2020, namely, appellant's supplemental brief regarding what the court (Judge Gibson) "knew or should have known when he ruled on a prior request to terminate guardianship filed by the maternal grandmother." The court (Judge Bigelow) considered appellant's supplemental evidence and found it was either known to appellant or not relevant to the issues at hand. The court found appellant "failed to show that her requested order to remove [the guardian] as the guardian for the children is in the best interest of the children." In that regard, the court found "no evidence ha[d] been presented that show[ed] by a preponderance of the evidence that the termination of

16

guardianship would be in the best interest of the children" and denied appellant's section 388 petition. In light of the court's ruling, the minors withdrew their section 388 petition regarding visitation. The court ordered once monthly supervised visitation between appellant and the minors.

## DISCUSSION

Appellant contends the juvenile court erred when it overturned another court's interim order for an evidentiary hearing on her section 388 petition and found instead that she failed to meet her prima facie burden to trigger an evidentiary hearing in the first instance. She further claims the court erred in applying the wrong standard to make that finding. Finally, she claims that even assuming the court applied the correct standard, it nonetheless abused its discretion when it denied her an evidentiary hearing. As we explain, the juvenile court did not err.

"A juvenile court order may be changed, modified or set aside under section 388 if the petitioner establishes by a preponderance of the evidence that (1) new evidence or changed circumstances exist and (2) the proposed change would promote the best interests of the child. [Citation.] A parent need only make a prima facie showing of these elements to trigger the right to a hearing on a section 388 petition and the petition should be liberally construed in favor of granting a hearing to consider the parent's request. [Citation.]" (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806; see *In re Daijah T.* (2000) 83 Cal.App.4th 666, 672.) The petitioner bears the burden of showing both a change of circumstance exists and that the proposed change is in the child's best interests. (*In re Michael B.* (1992) 8 Cal.App.4th 1698, 1703.)

The change of circumstances or new evidence "must be of such significant nature that it requires a setting aside or modification of the challenged prior order." (*Ansley v. Superior Court* (1986) 185 Cal.App.3d 477, 485; see *In re Jamika W.* (1997) 54 Cal.App.4th 1446, 1451.) When reunification services have been terminated and a section 366.26 hearing has already been set, a court assessing the child's best interests

17

must recognize the focus of the case has shifted from the parents' interest in the care, custody, and companionship of the child to the needs of the child for permanency and stability. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.) The child's best interests are not to undermine many years of stability to reward a parent for his or her "hard work and efforts to reunify." (*In re J.C.* (2014) 226 Cal.App.4th 503, 527.) The petitioner has the burden of proof by a preponderance of the evidence. (Cal. Rules of Court, rule 5.570(h)(1)(D); *In re L.S.* (2014) 230 Cal.App.4th 1183, 1193-1194.) In assessing the petition, the juvenile court may consider the entire history of the case. (*In re Justice P.* (2004) 123 Cal.App.4th 181, 188-189.)

The petition must be liberally construed in favor of its sufficiency. (Cal. Rules of Court, rule 5.570(a).) Nonetheless, if the juvenile court finds that even so construed the petition fails to make a prima facie case as to either or both tests under section 388, the court may deny the petition without an evidentiary hearing. (*In re Justice P., supra,* 123 Cal.App.4th at p. 189; *In re Jeremy W.* (1992) 3 Cal.App.4th 1407, 1414; *In re Zachary G., supra*, 77 Cal.App.4th at p. 806; see Cal. Rules of Court, rule 5.570(d).) A prima facie showing is not made "unless the facts alleged, if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition." (*In re J.P.* (2014) 229 Cal.App.4th 108, 127.) "In determining whether a parent has made a prima facie showing under section 388, we may consider the entire factual and procedural history of the case." (*In re Daniel F.* (2021) 64 Cal.App.5th 701, 711.)

We review the denial of a section 388 petition for abuse of discretion. (*In re S.R.* (2009) 173 Cal.App.4th 864, 870; *In re J.T.* (2014) 228 Cal.App.4th 953, 965.)

Appellant's section 388 petition (filed in July 2020) sought termination of the current guardianship and alleged as changed circumstances that she had previously filed a petition for guardianship with supporting declarations, neither of which were attached to her current petition. She further alleged her belief that the minors were unsafe living with the guardian because they had been exposed to substance abuse and had been homeless.

18

Finally, appellant alleged the requested change was in the minors' best interests because they would thrive in her care, she was an approved family resource member, she was a computer scientist for the U.S. Navy, and the minors' father had previously nominated her as the minors' guardian.

The allegations in appellant's petition were conclusory statements that provided no evidence to support either prong of appellant's position. "The change in circumstances supporting a section 388 petition must be material." (*In re N.F.* (2021) 68 Cal.App.5th 112, 120.) Appellant's petition, without more, did not establish a prima facie case such that the court was required to set an evidentiary hearing. Appellant asserts otherwise based on the fact that the court (Judge Gibson) ordered a hearing on her petition by signing a form JV-183 and checking the option that "the best interest of the child may be promoted by the request." Appellant argues Judge Bigelow improperly overruled Judge Gibson's interim ruling when Judge Bigelow found no decision had been issued on appellant's initial burden to make a prima facie case. Appellant further argues that she was never permitted to present evidence to meet her initial burden. We disagree on both counts.

The case of *In re G.B.* (2014) 227 Cal.App.4th 1147 is instructive. In *In re G.B.*, the mother filed a section 388 petition to modify the court's order denying her reunification services. (*In re G.B.,* at p. 1153.) The juvenile court filed a standard Judicial Council form JV-183 court order, checking the box to select an option "stating that a hearing was ordered to consider the petition 'because the best interest of the child may be promoted by [it],' " and setting a hearing date. (*Id.* at p. 1154.) The agency argued the mother had not met her prima facie burden. The mother responded that the petition showed a change of circumstances and, referring to the JV-183 order, stated that " 'the court has actually already signed off on that there is a prima facie case.' " (*Ibid.*) The court informed the parties that it had liberally construed the mother's petition to provide the parties the opportunity to argue whether there should be an evidentiary

19

hearing, "but that it had not necessarily concluded that mother had established a prima facie case entitling her to a full evidentiary hearing on the petition." (*Ibid.*) Thereafter, the juvenile court denied the petition without an evidentiary hearing, concluding the mother failed to establish a prima facie case. (*Ibid.*) The mother subsequently filed a second petition, which the court denied without an evidentiary hearing. (*Id.* at p. 1155.)

The mother appealed, arguing the form JV-183 ordered an evidentiary hearing on its face and, in any event, the allegations in the petition sufficiently established a prima facie case. (*In re G.B., supra*, 227 Cal.App.4th at p. 1158.) The Court of Appeal affirmed, concluding that, in checking the box on the form JV-183, the juvenile court "was not deciding that a prima facie case had been made but was instead scheduling the matter for the parties to argue the issue—an option not included on the form," as expressly clarified by the juvenile court at the hearing. (*Ibid.*) The appellate court noted that, even if it were to construe the form in the manner the mother argued, the court would nonetheless reject the mother's argument that the juvenile court was barred from changing its mind after considering the oral arguments of the parties. (*Id.* at p. 1160.)

The appellate court held, "A juvenile court has the authority to change, modify, or set aside a previous order sua sponte if it decides that a previous order was 'erroneously, inadvertently or improvidently granted.' [Citation.]" (*In re G.B., supra*, 227 Cal.App.4th at p. 1160.) In other words, "even if the juvenile court here had determined when it checked the box that mother's section 388 petition established a prima facie case, it retained the discretion to change that determination upon further consideration, and it did so. (§ 385.)" (*Ibid.*) Finally, the court concluded that, in any event, the petition's allegations did not sufficiently establish a prima facie case requiring an evidentiary hearing. (*Ibid.*) The court also concluded that the mother was not prejudiced by the juvenile court's denial of her second section 388 petition given all the evidence the juvenile court heard at the contemporaneous selection and implementation hearing. (*Id.* at pp. 1160-1162.)

20

Here, as in *In re G.B., supra,* 227 Cal.App.4th 1147, the form JV-183 order stated, "[t]he court orders a hearing on the form JV-180 request." The order did not contain any findings regarding appellant's burden of demonstrating a prima facie case, nor did it expressly order an *evidentiary* hearing. Indeed, the form instructs the court to review the section 388 petition "and either grant the request, deny the request, or set a hearing on the request."

Appellant argued Judge Gibson's order was dispositive of the prima facie question. The Agency argued it was not. Judge Bigelow initially found Judge Gibson did make a finding of changed circumstances, but eventually Judge Bigelow reserved on that issue and allowed appellant to present evidence in support of her petition. Citing the general rule that "one trial court judge may not reconsider and overrule an interim ruling of another trial judge" (*In re Marriage of Oliverez* (2015) 238 Cal.App.4th 1242, 1248), appellant claims Judge Bigelow improperly overturned Judge Gibson's order in the absence of any motion for reconsideration, additional evidence, or allegation of "inadvertence, mistake, or fraud" (*id.* at pp. 1248-1249). The claim lacks merit.

There are exceptions to the general rule against reconsideration, including that "a second judge may reverse a prior ruling of another judge if the record shows that it was based on inadvertence, mistake, or fraud" or "when the judge has considered further evidence and law" (*In re Marriage of Oliverez, supra*, 238 Cal.App.4th at pp. 1248-1249), or when necessary to prevent a miscarriage of justice (*In re A.V.* (2021) 73 Cal.App.5th 949, 957; *Nickolas F. v. Superior Court* (2006) 144 Cal.App.4th 92, 98). In other words, the juvenile court (Judge Bigelow) had the inherent authority to reconsider Judge Gibson's prior interim order.

Further, a juvenile court has statutory authority to modify its previous orders sua sponte. "Section 385 provides that any court order in a dependency case 'may at any time be changed, modified, or set aside, as the judge deems meet and proper, subject to such procedural requirements as are imposed by this article.' " (*Nickolas F. v. Superior*

21

*Court, supra*, 144 Cal.App.4th at pp. 111, 114, 116.)  Under section 385, "the juvenile court may . . . reconsider the substance of a previous order the court considers to have been erroneously, inadvertently or improvidently granted." (*Nickolas F.,* at p. 116.)  That is, "even if the juvenile court here had determined when it checked the box that [appellant's] section 388 petition established a prima facie case, it retained the discretion to change that determination upon further consideration, and it did so.  (§ 385.)" (*In re G.B., supra,* 227 Cal.App.4th at p. 1160.)

Here, Judge Bigelow initially concluded Judge Gibson had made a finding of changed circumstances.  However, the parties argued Judge Gibson signed the order ex parte in July 2021, before the dependency case was reopened and before counsel was reappointed in August 2021, and the fact that the JV-183 form was signed did not guarantee an evidentiary hearing.  After considering the parties' arguments, Judge Bigelow reserved ruling on the prima facie issue and allowed appellant to review the guardianship file and "argue a change in circumstances and best interests."  In that regard, the court heard extensive argument from appellant's counsel, who set forth 10 points to demonstrate changed circumstances or new evidence, including the dog bites suffered by N.B. and what appellant characterized as the guardian's "tremendous trauma" to and "horrible" neglect of the minors.

The court tentatively ruled appellant established neither a change of circumstances nor that the requested change was in the minors' best interests, but noted the ruling was subject to change based on evidence raised at the hearing on the minors' section 388 petition regarding visitation with appellant.  After considering appellant's evidence in opposition to the minors' petition, as well as all of appellant's evidence in support of her own petition and all of the evidence previously presented related thereto, the court found appellant failed to show the request was in the minors' best interests and denied the petition.  We conclude there was no error.

Appellant claims the court erred when it "expressly admitted" it applied the wrong standard regarding the prima facie determination. Appellant mischaracterizes the record. "Under section 388, a party 'need only make a prima facie showing to trigger the right to proceed by way of a full hearing.' " (*In re J.P., supra,* 229 Cal.App.4th at p. 127.) Thereafter, the petitioner has the burden of proof by a preponderance of the evidence to show both changed circumstances and that the proposed order is in the minor's best interests. (Cal. Rules of Court, rule 5.570(h)(1)(D); *In re L.S., supra*, 230 Cal.App.4th at pp. 1193-1194.) Here, the juvenile court repeatedly expressed the need for appellant to make a prima facie showing. The court also reiterated the preponderance of evidence burden of proof in the context of explaining what was necessary to demonstrate changed circumstances and best interests of the minors in order to grant the petition. While the court vacillated between whether or not appellant had indeed made a prima facie showing, in the end the court heard and considered all the evidence presented by appellant in support of her petition and in opposition to the minors' petition and found "no evidence has been presented that shows by a preponderance of the evidence that the termination of guardianship would be in the best interest of the children" and denied appellant's section 388 petition. The court applied the appropriate standard.

Finally, appellant contends that, even assuming no procedural error and application of the correct burden of proof, the court nonetheless abused its discretion in denying her petition. The claim lacks merit. Appellant's petition contained little more than appellant's statements of belief as to what new evidence or changed circumstances warranted removing the minors from the guardian's care. Similarly, her allegations of the minors' best interests included her belief that the minors would thrive in her care, and that she was approved as a family resource member, and was a computer scientist for the U.S. Navy. Over the course of the next four months, appellant filed four of her own declarations as well as declarations authored by father and a private investigator. The private investigator's declaration was of little benefit as it provided the investigator's own

23

opinions and beliefs, based on his interview of the guardian, as to whether the guardian was suited to provide appropriate care to the minors. Similarly, father's declaration provided father's own opinions and beliefs, based on his childhood being raised by the guardian, and was also of no benefit. Appellant's declarations set forth numerous reasons why appellant felt the guardian was a danger to the minors, was ill-suited to care for the minors, and was not in fact the guardian at all. Many of appellant's concerns were based on conjecture and speculation, information previously known or available to her, or information provided to her by a third person, and were based on her own perception of events and her opinions about how the minors should be cared for and why she was better suited as their guardian.

Even assuming the content of appellant's petition and supporting declarations could be construed as new evidence or changed circumstances, there was a dearth of evidence to demonstrate terminating the current guardianship and placing the minors with appellant was in the minors' best interests. Admitting stability and continuity are key to a best interests analysis, appellant argued she was nonetheless better suited to be the minors' guardian by comparing the guardian's qualifications to her own, namely that she moved from Kern County to Shasta County and purchased a home with space for the minors, she had been approved as a family resource, she was well educated and athletic, she volunteered at various programs, she was employed by the U.S. Navy, and she was financially stable. The court found "no evidence has been presented that shows by a preponderance of the evidence that the termination of guardianship would be in the best interest of the children" and denied appellant's section 388 petition. We conclude the juvenile court did not abuse its discretion in denying appellant's petition.

## DISPOSITION

The juvenile court's order is affirmed.

/s/
Robie, Acting P. J.

We concur:

/s/
Mauro, J.

/s/
Earl, J.